CHICAGO DISTRICT COUNCIL OF CAR-PENTERS PENSION FUND, Chicago District Council of Carpenters Welfare Fund, and the Chicago and Northeast Illinois District Council of Carpenters Apprentice and Trainee Program, Plaintiffs,

v.

SKENDER CONSTRUCTION COMPANY, INC., Defendant.

No. 97 C 2455.

United States District Court, N.D. Illinois, Eastern Division.

Sept. 28, 1998.

 

---

**5.** The plaintiff's motion to strike is denied as moot.

Brian Todd Garelli, Kevin Patrick McJessy, Lord, Bissell & Brook, Chicago, IL, for Chicago Dist. Council of Carpenters Pension Fund, Chicago Dist. Council of Carpenters Welfare Fund, Chicago and Northeast Illinois Dist. Council of Carpenters Apprentice and Trainee Program, plaintiffs.

Patricia Mary Fennell, Joseph Patrick Berglund, Stanley E. Niew, Kathleen I. Niew, Niew & Associates, P.C., Oakbrook, IL, for Skender Const. Co., Inc., defendant.

## MEMORANDUM OPINION AND ORDER

LINDBERG, District Judge.

Plaintiffs, the Chicago District Council of Carpenters Pension Fund, Chicago District Council of Carpenters Welfare Fund, and the Chicago and Northeast Illinois District Council of Carpenters Apprentice and Trainee Program Fund ("the Funds"), are multiemployer funded trust funds that provide pension, welfare and training benefits to members of the Chicago and Northeast Illinois District Council of Carpenters and affiliated or local unions. The Funds have brought this action pursuant to 29 U.S.C. § 1132, the Employee Retirement Income Security Act (ERISA), to compel defendant, Skender Construction, to reimburse them for fringe benefit contributions that Midwest Flooring Installation, Inc. ("Midwest Flooring"), a Skender subcontractor, failed to pay. The Funds assert that under § 15.1 of the Area Agreement, contractors are required to post a surety bond. They claim that Midwest Flooring failed to post a bond or to make contributions to the Funds and that as Midwest's general contractor, Skender is now liable for these contributions under § 3.4 of the Area Agreement, which mandates that employers assume the obligations for fund contributions for any subcontractor it hires that is not bonded according to the Area Agreement.

The Funds are organized and administered according to the Pension Fund Trust Agreement, the Trainee Program Fund Trust Agreement, and Welfare Fund Trust Agreement ("the Agreements"), as well as according to the terms of the Area Agreements negotiated between the Union and employers. The Funds collect contributions for all Union-member employees from employers that have agreed to be bound by the Trust and Area Agreements. These Agreements provide that the trustees may require security deposits or surety bonds to insure that contributions are made and that they may assess liquidated damages against an employer who fails to make "prompt payment."

Skender Construction is a general contractor with 19 employees. The company is a signatory to the Area Agreement and is therefore bound by its terms and by the terms of the Trust Agreements. Skender hires carpentry subcontractors also bound by the terms of the Area Agreement to perform much of the carpentry work for which Skender is responsible on a construction project. The Area Agreement requires any employer who subcontracts work within the jurisdiction of the Area Agreements to assume the obligation of its subcontractor to contribute to the Funds if the subcontractor fails to post a bond guaranteeing payment of wages and fringe benefits for its employees or if it fails to pay the contributions for hours worked by the carpenter employees.[1] For a subcontractor to be properly bonded so as to relieve a general contractor such as Skender from liability for the subcontractor's unpaid contributions, the subcontractor must obtain a surety bond guaranteeing the payment of wages and contributions to the Funds, payable to the Union, executed on a uniform bond form that the Union provides, filed with the Union and issued by an insurance carrier licensed to do business in Illinois. Without such a bond, the general contractor becomes responsible for the subcontractor's contributions if the subcontractor defaults.

During 1995 and 1996, Skender acted as the general contractor for the construction of 50 housing units on 31 sites for the H.U.D. Scattered Site Housing Project ("H.U.D. Project") for S & A Development, the owner of the property. In 1995 or 1996, Skender entered subcontracting agreements with Commercial Flooring/Midwest Flooring Installation,[2] a joint venture, under which Commercial Flooring was to supply all of the materials and Midwest Flooring was to employ all of the carpenters for installing the floors for the H.U.D. Project. Midwest Flooring was a signatory to the Area Agreement; Commercial Flooring was not. At that time, Skender did not typically check with the Union to see if a subcontractor was properly bonded.

Because the project was H.U.D. funded, Midwest Flooring was required to prepare and submit prevailing wage reports or certified payroll sheets for the work its employees performed. According to its contract with Skender, it submitted these billing requests by the 25th of the month for work performed the entire previous month. After Skender received the certified payroll sheets, it forwarded them to S & A Development. The certified payroll sheets indicate that Midwest carpenters performed 1,020.50 hours of work for Skender on the H.U.D. project. Once S & A Development approved the pay request, it directed First American Title Insurance Co., the title company on the project, to disburse the funds to the subcontractor.

Joseph Skender, the president of Skender Construction, testified that although Midwest Flooring worked for Skender beginning in 1995, Skender terminated that company and replaced it with Midwest Floor Covering on the H.U.D. project May 1, 1996. Mr. Skender stated that Midwest Flooring was not performing according to the contract and as a result was slowing its schedule on the project. Midwest Flooring did not perform any work on the H.U.D. project after May 1, 1996.

On January 30, 1996, the Funds obtained a judgment against Midwest Flooring for $17,622.92 in unpaid contributions to the Funds as well as audit and attorneys fees and costs. The judgment covered contributions due from March 1994 to March 1995 and May 1995 to November 1995, including the time during which Midwest Flooring performed work for Skender on the H.U.D. project. The Funds reviewed its own records as well as Union records to determine whether Midwest had filed a surety bond with the Union but concluded that it had not. Skender denies this, claiming that a certificate of insurance that Midwest Flooring filed with the Union indicates that it had procured a surety bond. However, the Funds claim that the document Skender relies on is not a proper form required under the Area Agreement.

---

1. The contribution rate for the time period at issue in this litigation (June 1995 through April 1996) was $6.45/hour.

2. Midwest Flooring was an Illinois corporation involuntarily dissolved by the Illinois Secretary of State on September 1, 1995.

Pursuant to a citation to discover assets that issued to Midwest Flooring, the Funds collected $6,174.86 from the company on July 24, 1996, that is currently in the Funds' escrow account. The Funds also issued a citation to Skender Construction for any money it still owed Midwest Flooring. As Skender was not making any further disbursements to Midwest, the Funds obtained no funds from it. Of the $6,174.86 the Funds collected from Midwest, $5,174.86 was in the form of a check dated March 13, 1996, from First American Title Insurance Co. that was payment for work performed under the subcontract with Skender on the H.U.D. project.

Sometime between late January and late February 1997, Skender received a notice from the Union stating [3] that:

"it has come to our attention that you have subcontracted carpentry work to Midwest Flooring Installation, Inc.... According to our records, Midwest Flooring Installation, Inc. is not bonded in accordance with the Area Agreement. Since this subcontractor is not bonded, we are reminding you that you may find yourself in a position, pursuant to Section 3.4 of the Area Agreement, where you will be required to make fringe benefit contributions on behalf of the subcontractor's employees in the event the subcontractor does not do so ... It is extremely important that you make sure your unbonded subcontractor is paying the correct wages and fringe benefit contributions on a timely basis ."

Joseph Skender stated that he read the notice but took no action after receiving it because of a statement in the letter that it was "sent for informational purposes" and included no request for a specific sum of money and because Midwest Flooring had not performed any work for Skender since May 1, 1996.

James Egan & Associates, Ltd., the auditors for the Funds, received a request to perform an audit of Skender's books and records in March 1997. An audit of a general contractor is one way to determine how much the contractor may owe the Funds for the unpaid contributions of its subcontractors. Although the Skender employee responsible for gathering records in Skender's possession indicated that she made the "payroll sheets" available for the audit, the Funds deny that it had the certified payroll reports available during the audit and that they did not receive these documents until discovery began in the instant action. Kevin Wheeler, a staff accountant at James Egan & Associates, indicated that he did not review the certified payroll reports and instead estimated the hours Midwest Flooring worked for Skender by reviewing the invoices from Midwest Flooring and applying a labor factor of 33% to those records. Because this method was used, the contributions hours calculated in the audit were estimates only.

The Funds filed the instant suit against Skender on April 9, 1997, while the audit was proceeding, seeking payment of at least $12,167.97. On June 23, 1997, the Funds received the audit results, which indicated that the contributions Skender owed totaled $3,914.97 for the period July 1, 1995, through December 31, 1996.[4] On June 27, 1997, the Funds informed Skender that its liability in the matter now totaled $19,015.28, including the $14,201.92 judgment against Midwest Flooring, $1,377 in auditor fees, $2,873.87 in liquidated damages, $1,704.16 in interest, and $5,033.87 in attorneys' fees and costs. This amount was reduced by the $6,174.86 held in escrow to arrive at the $19,015.28 figure.

Skender responded to the Funds' discovery requests on July 14, 1997, producing Midwest's payroll sheets for the H.U.D. project. Skender also served its own discovery requests, seeking to determine how the Funds arrived at the $12,167.97 amount due alleged in the complaint. On August 25, 1997, Skender filed a motion for sanctions in the case, claiming that the amount the Funds were seeking in the complaint included contributions for work Midwest Flooring per-

---

**3.** The court has omitted the misspellings and grammatical errors contained in the notice.

**4.** The Funds contend that because the auditors did not have the certified payroll records, the amount of contributions alleged due for the period at issue was only an estimate. They also claim that the audit did not include hours Midwest Flooring worked on the H.U.D. project in June 1995.

formed for other general contractors and for which Skender was therefore not liable. The Funds were aware that Midwest Flooring also worked for another general contractor, Joseph J. Henderson & Son, but did not know to what extent that firm owed the Funds for contributions.[5] The Funds assert that the basis for the amount alleged in the complaint was that although Midwest Flooring had identified other general contractors it had worked for, subpoenas to these contractors revealed no record of their having employed Midwest Flooring. As a result of the motion for sanctions, the Funds filed an amended complaint on September 22, 1997, alleging that Skender owed them $6,582.23. On October 17, 1997, Skender paid the Funds $1,407.37 and directed them to apply it to the amount due alleged in the complaint. This amount reduced Skender's alleged liability (not including liquidated damages, interest or attorneys' fees) to $5,174.86, which was the amount of the check Midwest Flooring turned over to the Funds pursuant to the citation to discover assets. The Funds assert that as of October 17, 1998, they had incurred $9,372.35 in attorneys' fees and costs, plus liquidated damages.

The parties have now filed cross motions for summary judgment. Skender claims that it has a special equity in the $5,174.86 check that Midwest Flooring turned over to the Funds because American Title Insurance Co. disbursed the check for payment on Midwest's subcontract with Skender. Therefore, according to Skender, because it also paid $1,407.37 directly to the Funds, the $6,582.23 liability alleged in the complaint has been reduced to zero. Skender moves for summary judgment only on this issue. The Funds request summary judgment only as to the issue of whether Skender is liable for the unpaid fringe-benefit contributions that Midwest Flooring owes the Funds for 1020.5 hours of work performed on the H.U.D. project. Neither party directly addresses the liability for attorneys' fees, liquidated damages and costs.

Skender's argument is brief. Although it is the general rule in Illinois that a creditor (the Funds) may apply payments as it chooses where the debtor (Midwest Flooring) fails to designate the specific debts to which those payments are to be applied, an exception exists where the debtor received the money from a third party (Skender) that would itself be liable for the debt if the money were not applied to that party's liability. *Alexander Lumber Co. v. Aetna Accident and Liability Co.*, 129 N.E. 871, 873, 296 Ill. 500, 506 (1921). Skender assumed the obligation to pay the contributions Midwest Flooring owed to the Funds for the H.U.D. project only. Because the $5,174.86 check that Midwest Flooring turned over to the Funds to partially satisfy the judgment against it was disbursed to Midwest Flooring out of Skender's escrow account at First American Title Insurance Co. and because it was payment for work on the H.U.D. project, Skender argues that it has a special equity in this payment, which must be applied to its own obligation to the Funds.

In *Alexander*, the plaintiff lumber company sued Aetna on the bond that company had issued to secure the performance of Freeman & Brooks, the general contractors hired to construct a building for the University of Illinois. *Id.* 296 Ill. 500, 129 N.E. at 871. Plaintiff sought payment on the bond for $15,790.13 in materials it had supplied Freeman & Brooks for the project. Freeman & Brooks had paid Alexander $26,000 during the construction but the lumber company had applied the payment to debts Freeman & Brooks had with it that predated the University of Illinois project. Alexander was not aware of the source of the payment it received from Freeman & Brooks and had received no direction as to which debts the payment should be applied. *Id.* 296 Ill. 500, 129 N.E. at 872.

Aetna contended that "it had a special equity in the fund derived from the contract of Freeman & Brooks with the state of Illinois" and that, as a result, it had "the right to have the payments of money derived from

---

**5.** The Funds audited Joseph J. Henderson & Son and resolved their claims for contributions with-   in the audit.

the construction contract in question applied to the account for materials furnished by [the lumber company] for such building." *Id.* The plaintiff responded that because Freeman & Brooks did not direct it to apply the payment to a particular debt, under Illinois law it was allowed to apply it to whichever of Freeman's debts it wished. The Illinois Supreme Court held that "(i)t was plainly the intention of the parties that this bond was not to cover the open account of Freeman & Brooks generally, but to apply only to materials furnished to the building in question." *Id.* 296 Ill. 500, 129 N.E. at 873. Therefore, Aetna had a special equity in the funds that arose under the construction contract it had insured and a right to have payments from the contractors applied to the debts arising under the contract. *Id.* To hold otherwise would be to require the surety to insure for debts not included in its contract.

Skender compares itself to Aetna, claiming that it agreed to assume obligations as to Midwest's contributions on the H.U.D. project only. Because its payment to Midwest for the H.U.D. project was turned directly over to the Funds, Skender maintains that it has a special equity in this payment and that it should apply to Skender's obligation to the Funds.

In their response, the Funds note that Skender does not deny that it is liable for Midwest's contributions or that those unpaid contributions total $6,582.23. Skender merely claims that its liability has been reduced to zero because of the $1,407.37 it paid directly to the Funds and the $5,174.86 check the Funds received from Midwest Flooring. The Funds assert that Skender's motion should be denied because the $5,174.86 check should not apply to Skender's outstanding liability. Even if it were so applied, the Funds note that the payments they have received from Skender do not cover attorneys' fees, interest and liquidated damages to which they are entitled.

As to the application of the $5,174.86 check to Skender's liability, the Funds claim that they should be able to apply money obtained from Midwest Flooring to the least-secured portion of the judgment against it. As support, they cite *Ohio Electric Car Co. v.*

*LeSage,* 247 P. 190, 198 Cal. 705 (Cal.1926), which they claim involves the exact issue presented here. In *LeSage,* the Supreme Court of California held that funds a judgment creditor recovered from the debtors in post-judgment collection proceedings would not be apportioned against a claim the creditor subsequently brought against the surety, even though the surety had not guaranteed the entire debt at issue but only a portion thereof. *Id.* 247 P. at 193, 198 Cal. 705. The Funds claim that this case supports their decision to apply the check from Midwest to the portion of the judgment that was not secured by Skender so that they may collect on as much of the outstanding judgment against Midwest Flooring as possible. The crucial difference between *LeSage* and the instant case-and the reason it does not address the issue presented here-is that the money the creditor in *LeSage* recovered from the debtors in the post-judgment proceedings did *not* derive from the surety, it derived from the sale of the property of the debtors themselves. *Id.* 247 P. at 191, 198 Cal. 705.

■ Generally, when applying state law concepts to questions of law in ERISA actions, the issue of preemption arises. While the federal courts must apply federal common law to ERISA claims, they are not barred from borrowing from state common law concepts as long as doing so does not conflict with ERISA's provisions or frustrate its objectives. *Boggs v. Boggs,* 520 U.S. 833, 117 S.Ct. 1754, 1760, 138 L.Ed.2d 45 (1997); *see also Haley v. American International Life Assurance,* 789 F.Supp. 260, 262 (N.D.Ill.1992) (because federal common law on defining a policy term was "still in its formative stage," court looked to state law that interpreted identical language). Although the Funds never raised the argument that the state law Skender cites is in conflict with ERISA's purposes, the court must bear those purposes in mind when determining how the payment should be applied.

In this instance, the state cases do not necessarily clarify what is the most equitable resolution in an ERISA context. In *Laborers' Pension Fund v. Concrete Structures of the Midwest, Inc.,* the defendant-the general contractor-argued that Illinois surety law

barred the Funds from recovering its subcontractor's delinquent contributions from it. 999 F.2d 1209, 1212 (7th Cir.1993). The Seventh Circuit held that "ERISA's broad preemption clause does not allow state surety law to diminish the Funds' right to recover unpaid contributions under ERISA." *Id.* (citing 29 U.S.C. § 1144(a)). The district court had held that the plain language of the surety provision in the Area Agreement-similar to the one at issue here-was "unequivocal and stated without limitation." *Laborers' Pension Fund v. Concrete Structures of the Midwest, Inc.,* 1992 WL 170548, *3 (N.D.Ill.). "In signing the labor agreement, [defendant] bound itself to ensure payment of delinquent pension contributions arising from contract work performed by any of its subcontractors." *Id.* The completion of the contract (and presumedly the payment in full on the contract) did not affect the clear terms of the surety agreement, which required the contractor to assume liability for its subcontractor's delinquency.

Similarly, Skender contracted in the Area Agreement to act as a surety for its unbonded subcontractors. Although subcontractors obviously pay their contributions from the proceeds of a contract, the liability Skender incurred as to the Funds is not for payment on the contract; its obligation to pay contributions is a separate and distinct liability from any obligation to pay its subcontractors. Had Skender paid Midwest Flooring earlier and the proceeds been incorporated into the company's general accounts before the hearing on the citation to discover assets, Skender would not be in the position to argue that its previous payment should be applied to its liability for contributions. It appears that it is only the fortuitous timing of Midwest's receipt of the check from Skender and the fact that it had not yet cashed it that has even led to the instant situation. The Area Agreement simply does not state that payment in full on the contract releases Skender from liability. *See, e.g., United States ex rel. Maddux Supply Co. v. St. Paul Fire & Marine Insurance Co.,* 86 F.3d 332, 334–35 (4th Cir.1996). In *Maddux,* the court noted that under the Miller Act, which requires a government contractor to post a surety bond on contracts of $25,000 or more, a contractor was not relieved of liability for a subcontractor's debts even though it had paid the subcontractor in full. *Id.* The court based this holding on the fact that the Miller Act " 'should receive a liberal construction to effectuate its protective purposes.' " *Id.* (quoting *United States ex rel. Sherman v. Carter,* 353 U.S. 210, 216, 77 S.Ct. 793, 1 L.Ed.2d 776 (1957)). Similarly, the purpose of § 1145 of ERISA is to allow benefit funds "to recover delinquent contributions efficaciously, and without regard to issues which might arise under [other areas of labor law]. Sound national pension policy demands that employers who enter into agreements providing for pension contributions not be permitted to repudiate their pension promises." *Central States, Southeast & Southwest v. Gerber Truck,* 870 F.2d 1148, 1152 (7th Cir.1989). The court finds that this holding applies with even more force when the source of the conflicting concept is state law, which is preempted to the extent it conflicts with ERISA's purposes. For these reasons, the court declines to apply *Alexander*'s concept of "special equity" to hold that Skender's payment to Midwest Flooring must be applied to its obligation to the Funds. It therefore denies Skender's motion for summary judgment.

This brings the court to the Funds' motion for summary judgment, in which they assert that Skender is liable for the unpaid fringe-benefit contributions for 1020.5 hours of work on the H.U.D. project that Midwest Flooring owes the Funds. They claim that under the plain terms of the Area Agreement, a general contractor is liable for fringe benefit contributions of its unbonded subcontractor. They point out that Skender has admitted the following facts: it is bound by the terms of the Area and Trust Agreements; these Agreements require it to assume obligations of unbonded subcontractors; and it entered a subcontracting agreement with Midwest Flooring. The Funds assert that these admissions, coupled with its judgment against Midwest Flooring for unpaid contributions, leave no question as to Skender's liability.

Skender makes several attempts to deny liability, none of which the court finds persuasive. In its response to the Funds' mo-

tion for summary judgment, Skender claims that a genuine issue of material fact exists as to the number of hours Midwest Flooring actually worked for Skender, as to whether Midwest Flooring actually posted a bond with the Union and as to whether this claim should be subject to arbitration.[6]

■ Skender claims that the 1020.5 hours for which the Funds claim contributions are due are high for the amount of work Midwest Flooring actually performed on the H.U.D. project. The hours alleged were derived from the certified payroll reports that Skender produced to the Funds during discovery. Skender argues that the Funds cannot use such documents to support their claim because they made no attempt to authenticate the payroll reports, which are therefore not admissible as business records. The court notes, however, that Skender compiled these records, produced the certified payroll reports on which the hours were based and did not dispute the accuracy of Midwest Floorings' hours during the performance of the contract. *See United States v. Lawrence,* 934 F.2d 868, 870–72 (7th Cir.1991). Skender does not deny that it paid Midwest Flooring according to those payroll reports.[7] It cannot now complain that the hours for which it paid Midwest Flooring on the project cannot now support the number of hours for which contributions are due. These records therefore substantiate the number of hours the Funds claim Midwest Flooring worked for Skender.

■ Skender also disputes the inclusion of hours of Earnest O'Neal, Midwest Flooring's owner. It claims that because Midwest Flooring was dissolved as a corporation on September 1, 1995, O'Neal was operating as a sole proprietorship. It claims that a sole proprietor cannot contribute benefits on his own behalf to a plan because "the assets of a plan shall never inure to the benefit of any employer," citing 29 U.S.C. § 1103(c)(1) and *Peckham v. Board of Trustees,* 653 F.2d 424 (10th Cir.1981) (citing § 1103(c)(1) and 29 C.F.R. § 2510.3–3(c)(1)). Of course, this would not create a genuine issue as to Skender's liability but only as to the damages for the 106 hours O'Neal worked on the H.U.D. project.[8] The Funds respond that at all relevant times, Midwest Flooring held itself out as a corporation and formed contracts as a corporation and that Skender dealt with it as such and identified it as such in the invoices to First American Title Insurance Co. They claim that this estops Skender from now denying that Midwest Flooring was a corporation. *See Davane, Inc. v. Mongrieg,* 193 Ill.App.3d 636, 640, 140 Ill.Dec. 573, 550 N.E.2d 55, 58 (1990).[9] Even more to the point, the Seventh Circuit has indicated that although § 2510.3–3(c)(1) states that a sole owner does not qualify as an employee under ERISA, "several courts of appeal have held, properly in our view, that this regulation means only that a one-person corporation must use a Keogh plan rather than an ERISA plan for its solitary employee; a firm with multiple employees may establish an ERISA pension or welfare plan in which the investor may participate." *In the Matter of Baker,* 114 F.3d 636, 639 (7th Cir.1997). As Midwest Flooring employed workers in addition to Earnest O'Neal, he was qualified to participate in an ERISA plan and his hours will be included in the total.

---

6. Skender argues that because the Funds claim Skender is liable under the plain meaning of Section 3.4 of the Area Agreement, the dispute requires interpretation of the Agreement and is therefore subject to arbitration. Defendant waived any possible right to arbitration by failing to raise it before this late stage in the proceedings. Also, the plain language of the contract makes any interpretation of the Area Agreement unnecessary.

7. Besides citing a vague statement Joseph Skender made that the hours seemed high for the work performed, Skender made no attempt to establish that Midwest Flooring's reports were false or what the correct number of hours was.

8. This would reduce the damages by $683.70, which is the hourly contribution rate of $6.45/hour multiplied by the 106 hours O'Neal worked after Midwest Flooring was dissolved.

9. Skender also attempts to create a genuine issue as to the amount of damages by questioning whether the Funds are requesting damages for employees whose contribution hours were removed after the audit. The Funds point out that the document upon which Skender relies includes information for March 1994 and the relevant time in this case is from June 1995 to May 1996.

■ The court dismisses Skender's contention that there is a question of fact as to whether Midwest Flooring was properly bonded when it worked on the H.U.D. project. Skender states that at the close of discovery, the Union provided a certificate of insurance for a wage and welfare bond that it claims Midwest filed with the Union. It asserts that this is "undoubtedly evidence that Midwest procured a bond." Both the Secretary of the Union and the Funds' assistant contributions manager testified that Midwest Flooring was not bonded according to Article XV of the Area Agreement. Skender does not dispute that a proper bond is a surety bond guaranteeing payment of wages and contributions, payable to the Union, executed on a uniform bond form, filed with the Union and issued by an insurance carrier licensed to do business in Illinois. The document on which Skender relies to assert that Midwest Flooring was bonded is a certificate of insurance, which lists Midwest Flooring's wage and welfare bond as "pending." The document also indicates that the pending bond provides coverage from March 15, 1994, until March 15, 1995. The period at issue here-when Midwest Flooring worked on the H.U.D. project for Skender-was from June 1995 to May 1996. No genuine issue exists as to whether Midwest Flooring was bonded according to the Area Agreement; the record establishes that it was not. For the foregoing reasons, the court finds that Skender is liable for its subcontractor's contributions to the Funds and grants the Funds' motion for summary judgment.

■ Because there is "judgment in favor of the plan," an award of attorneys' fees is mandatory. 29 U.S.C. § 1132(g)(2). The Funds are also entitled to liquidated damages and interest without regard to any partial payment before judgment. *Chicago District Council of Carpenters Pension Fund v. Industrial Erectors, Inc.*, 840 F.Supp. 1248, 1254 (N.D.Ill.1993) ("many circuits have held that as long as there were unpaid contributions at the time the plaintiff filed suit, the plaintiff is entitled to interest and liquidated damages even if the defendant tendered the unpaid contributions prior to judgment"). The court therefore rejects Skender's argument that any fee in this case is unreasonable because the suit need not have been brought in the first place. The suit was *per se* reasonable because contributions were owed at the time it was filed. However, because the Funds did not submit a detailed fee petition, the court declines to specify at this time the amount of attorneys' fees it will award.

ORDERED: For the foregoing reasons, the court denies defendant's motion for summary judgment and grants plaintiffs' motion for summary judgment. Plaintiffs are to file a detailed fee petition with the clerk's office and submit a proposed judgment order to chambers by October 9, 1998.